IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARY NOVEL,<br>Individually and on behalf of a class, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 07 C 6309 |
| JADE, LLC, SPRING GROUP, INC.<br>d/b/a SPRING RESTAURANT and/or<br>d/b/a SPRING, | ) ) ) ) | Judge Moran<br><br>Magistrate Judge Schenkier |
| Defendants. | ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants Jade, LLC, and Spring Group, Inc. d/b/a Spring Restaurant and/or d/b/a Spring (hereinafter "Jade"), through the undersigned attorneys, Hall Prangle and Schoonveld, LLC, submit the following Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Second Amended Complaint (hereinafter "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").  In support thereof, Jade states as follows:

### INTRODUCTION

This lawsuit is one of a multitude of class actions filed across the country seeking to take advantage of the well-reported confusion surrounding a recent amendment to the Fair Credit Reporting Act ("FCRA").  *See* 15 U.S.C. § 1681c(g) ("Section 1681c(g)").  As of December 4, 2006, the Fair and Accurate Credit Transactions Act ("FACTA"), amended the consumer protection provisions in FCRA.  FACTA requires that:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

15 U.S.C. § 1681c(g)(1).

The willful failure to comply with FACTA subjects the violator to substantial penalties and civil exposure, including statutory damages of $100 (minimum) to $1,000 (maximum) per consumer, punitive damages, costs of the action and attorney's fees. A negligent violation subjects the violator to actual damages, costs of the action and attorney's fees. Significantly, FCRA does not cap the aggregate statutory damages available in a consumer class action.

Since December 2006, hundreds of class action lawsuits have been filed across the country under FACTA. These lawsuits (like Plaintiff's here) seek enormous statutory damages, punitive damages and attorneys' fees but claim no actual harm.

In a speculative and conclusory manner, Plaintiff claims Jade willfully violated § 1681c(g) when it failed to redact the expiration date from computer-generated receipts. Complaint, ¶¶ 19, 29, 44. Plaintiff's Complaint fails as a matter of law for two reasons. First, Plaintiff has failed to plead sufficient facts to state a plausible claim for a willful violation. Second, the requirements of § 1681c(g) are vague and ambiguous, and, therefore, cannot serve as the basis for a willful violation.

The United States Supreme Court issued two key decisions in the last year that support the dismissal of Plaintiff's Complaint.[1] In *Bell Atlantic*, the Supreme Court held that a complaint is subject to dismissal if it does not allege actual facts "plausibly" supporting (as distinguished from "possibly" supporting) the alleged violation. *Bell*

---

[1] See *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (May 21, 2007) and *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (June 4, 2007).

*Atlantic,* 127 S. Ct. at 1969-1970. In *Safeco,* the Supreme Court held that "willful" means a knowing or reckless disregard of the specific legal obligation violated. *Safeco,* 127 S.Ct. at 2208. Accordingly, under these two cases, Plaintiff must plead facts plausibly demonstrating that Jade knowingly violated Section 1681c(g)'s purported requirement that expiration dates be redacted or was aware of the alleged requirement and acted with reckless disregard in violating it. As discussed herein, Plaintiff bases much of his Complaint on "information and belief" and, as such, cannot set forth a willful violation of 1681c(g)'s vague and ambiguous provisions. Accordingly, Plaintiff's Complaint must be dismissed.

## ARGUMENT

### I.    Plaintiff Has Failed To Plead Sufficient Facts To State A Plausible Claim For A Willful Violation Of Section 1681c(g).

Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(6) because he has failed to state a claim for a willful violation of Section 1681c(g). Under Rule 8(a)(2), a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Conley v. Gibson*, 78 S.Ct. 99, 102 (1957), the Supreme Court interpreted this language to mean that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

However, in *Bell Atlantic*, the Supreme Court clarified this standard and concluded that *Conley's* "no set of facts" language "has earned its retirement." *Bell Atlantic,* 127 S.Ct. at 1969. In *Bell Atlantic*, the Supreme Court held that a viable complaint must include "enough facts to state a claim to relief that is plausible on its

face." *Bell Atlantic*, 127 S.Ct. at 1974.  The Court further noted that "[f]actual allegations must be enough to raise a right to relief above the speculative level" *Id.* at 1965.

In this case, Plaintiff has pled bare conclusory allegations of "willful" violations of Section 1681c(g) based primarily "on information and belief."  Plaintiff's conclusory and speculative Complaint is insufficient to survive this Motion to Dismiss.

### a.    The Supreme Court Defined A "Willful" Violation Of FCRA As A Knowing Or Reckless Disregard Of The Law.

In *Safeco*, the Supreme Court held that the term "willful," as used in FCRA, means a knowing or reckless disregard of the law. *Safeco*, 127 S.Ct. at 2208.  The Supreme Court explained that a reckless act is one entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known . . . . It is a high risk of harm, objectively assessed, that is the essence of recklessness at common law.  There being no indication that Congress had something different in mind, we have no reason to deviate from the common law understanding in applying the statute." *Id.* at 2215 (internal quotations and citations omitted).  The Supreme Court further held that "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.*

In *Safeco,* defendant Safeco was aware of its legal obligation under FCRA, but interpreted the requirement in such a way that its actions did not violate the statute. *Id.* at 2215.  The Supreme Court held that Safeco's reading of the statute was merely careless;

thus, its violation of the statute was not reckless and did not fall under the willful violation penalties found in Section 1681n. *Id.*

In this case, Plaintiff has pled solely "on information and belief" that Jade had knowledge of its requirements under FACTA, but pleads no facts that make this allegation plausible on its face. Additionally, Plaintiff has failed to plead facts sufficient to establish that Jade ran a high risk of violating FACTA by acting in a manner that was substantially more than "merely careless."[2] Plaintiff simply has not sufficiently pled that Jade acted with knowing or reckless disregard of its legal obligations under Section 1681c(g).

### b. Under *Bell Atlantic,* Plaintiff Failed To Plead Sufficiently That Jade Knowingly Or Recklessly Disregarded The Law.

As discussed above, in *Bell Atlantic,* the Supreme Court heightened the standard under which pleadings are scrutinized. Plaintiff must plead sufficient *factual* allegations "to raise a right to relief above the speculative level." *Bell Atlantic,* 127 S.Ct. at 1965. Plaintiff can no longer rely upon "labels and conclusions." *Id.* Plaintiff must plead facts to establish a claim is *plausible* - not simply *possible. Id.* In this case, Plaintiff cannot satisfy *Bell Atlantic's* standard.

In his Complaint, Plaintiff's only pertinent factual allegations are as follows: (1) "On October 25, 2007, Plaintiff received from Spring a computer-generated cash receipt which displayed Plaintiff's MasterCard card expiration date;" (2) "The requirement was widely publicized among retailers;" and (3) "Most of Defendants' business peers and competitors readily brought their credit card and debit card receipt printing process into

---

[2] It is assumed solely for the purpose of this argument and this Motion that Jade was aware of the requirements in Section 1681c(g).

compliance with FACTA by programming their card machines and devices to comply with the truncation requirement.   Defendants could have readily done the same." Complaint, ¶¶ 19, 37, 43.

Plaintiff cannot impute knowledge and understanding of the requirements of Section 1681c(g) to Jade solely because the requirements of Section 1681c(g) allegedly were published to unidentified "retailers" or because some of Jade's "business peers and competitors" programmed their card machines to prevent them from printing no more than the last five numbers of the card number and/or the expiration date.  Furthermore, the fact that Jade may have printed Plaintiff's card expiration date on his receipt does not state a claim for a willful violation - although it may state a plausible claim for a negligent violation of Section 1681c(g).

In an attempt to gloss over these glaring deficiencies, Plaintiff included a number of paragraphs regarding measures that credit card companies have taken to prevent identity theft.  Complaint ¶¶ 36 - 42.  These allegations are of no significance or even relevance.  Even if Jade had been aware of and disregarded the credit card companys' policies, that begs the question.  Plaintiff still has failed to set forth facts sufficient to establish that Jade was aware of or disregarded FACTA's requirements.

In a nutshell, Plaintiff claims that:   1) he received a receipt; 2) unidentified retailers knew about the requirements; 3) Jade must have known about the requirements; and 4) Jade violated the statute.  This reasoning is faulty.

Plaintiff does not make any factual allegations that Jade had any knowledge, imputed or otherwise, about the requirements of Section 1681c(g) or that Jade recklessly disregarded those requirements.  Plaintiff does not allege Jade had actual notice of the

requirements.  Plaintiff does not allege facts to show that Jade received, read or understood such notice.  Plaintiff does not allege facts demonstrating Jade knew of its business peers and competitors' actions, knew of the reasons for their actions, or took an unjustifiably high risk in not complying.  In short, Plaintiff does not allege sufficient facts to show that Jade was more than "merely careless."

Plaintiff's Complaint equates mere noncompliance with FACTA to a willful violation.  As the Supreme Court made clear, such pleadings are insufficient.  Plaintiff's factual allegations do not move his claim from the realm of possibility to the realm of plausibility.  Accordingly, Plaintiff's Complaint should be dismissed.

### c. Plaintiff's Allegations Based "On Information And Belief" Cannot Satisfy The *Bell Atlantic* Standard.

Plaintiff's remaining willfulness allegations are based only "on information and belief" and do not satisfy the *Bell Atlantic* standard.  Such allegations, including the bare conclusory allegation that, "[o]n information and belief, defendant knew of the truncation requirement and prohibition on the printing of expiration dates or was reckless in its failure to follow those requirements," and that "[o]n information and belief, VISA, MasterCard, the PCI Security Standards Council . . . informed Defendants about FACTA" are no more than speculation.  Complaint ¶¶ 35, 36;  S*ee. e.g., De La O v. Housing Auth. Of the City of El Paso, Texas*, 417 F.3d 495, 501-02 (5th Cir. 2005)(referring to allegations "on information and belief " as speculation).  Pleading based "on information and belief" alone does not satisfy the *Bell Atlantic* standard.  Plaintiff must set forth more than a speculative right to relief.  *Bell Atlantic*, 127 S.Ct. at 1965.  As Plaintiff has failed to do so, his Complaint must be dismissed.

> **d.    Even If Plaintiff's "On Information And Belief" Allegations Are Considered Under *Bell Atlantic*, Plaintiff Still Has Failed To Plead Sufficiently A Willful Violation Of Section 1681c(g)**

Even if Plaintiff's "on information and belief" allegations are considered, he still has failed to plead a willful violation of Section 1681c(g) beyond mere legal conclusions. Plaintiff does not plead any factual allegations to support his bare conclusory claim that Jade knew of the undefined "truncation requirement" and knowingly elected not to comply with it. Plaintiff's pleading does not show that Jade engaged in any knowing or reckless violation of Section 1681c(g).

Plaintiff failed to plead, nor could he, that: (1) Jade knew a high risk of harm existed from printing an expiration date on a card receipt; or (2) a high risk of harm from printing an expiration date on a card receipt is so obvious that Jade should have known of such risk. Indeed, other federal courts have recognized that "it appears virtually impossible for the inclusion of the expiration date on a credit card or debit card receipt to result in identity theft or any other actual harm." *Soualian v. International Coffee and Tea LLC*, 2008 WL 410618 (C.D.Cal.June 11, 2007)(See p. 5 of Exhibit A, attached hereto); *see also Spikings v. Cost Plus, Inc.,* No. 06-8125-JFW, (C.D.Cal. May 25, 2007). For the reasons discussed above, Plaintiff's Complaint must be dismissed.

## II.    The Vague And Ambiguous Requirements Of Section 1681c(g) Negate The Possibility Of A Willful Violation Based Solely On Providing A Receipt With A Card Expiration Date.

In addition, Plaintiff's Complaint must be dismissed because Jade's alleged conduct could not have willfully violated the vague and ambiguous requirements of Section 1681c(g). Section 1681c(g) provides that companies should remove all but the last five digits of the credit card number *or* (instead of "and") the expiration date from a

receipt. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513, 1520 (2003) (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996))("elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose").

Section 1681c(g) contains a grammatical error that makes the language of the statute vague and ambiguous. Section 1681c(g) states; "[n]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number *or* the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g) (emphasis added). Because Congress used "or" instead of "and," the plain language of Section 1681c(g) is susceptible to three reasonable interpretations:

1)    no person shall print: (a) more than the last five digits of the card number on the receipt; *or* (b) the expiration date on the receipt;

2)    no person shall print: (a) more than the last five digits of the card number on the receipt; *and* (b) more than the last five numbers of the expirations date on the receipt; and

3)    no person shall print: (a) more than the last five digits of the card number on the receipt; *and* (b) the expiration date on the receipt.

Simply put, the statute would have indicated that both items are prohibited if the term "either" appeared on its face – but it does not.

Plaintiff's allegations that Jade "knew" of the expiration date requirement are not only conclusory, but specious, given that the Federal Government apparently was not

aware of such a requirement.  This point is demonstrated by several federal documents, including the following:

1)  A Press Release from President George W. Bush which states, in pertinent part, that FACTA will accomplish several key priorities by:

> Helping prevent identity theft before it occurs by requiring merchants to leave all but the last five digits of a credit car number off store receipts.

The President's report of FACTA fails to mention anything about expiration dates.  (See p. 1 of Exhibit C, attached hereto).

2)  At a hearing on identity theft before the Sub-Committee on Social Security of the House Committee on Ways and Means, Director of the Federal Trade Commission's Bureau of Consumer Protection, Howard Beales, III, testified:

> FACTA seeks to reduce this source of fraud by requiring merchants to truncate the full card number on electronic receipts.

Of significance, the Committee testimony from the FTC director did not mention anything about the removal of expiration dates.  (See p. 7 of Exhibit D, attached hereto).

In addition,

3) A FTC news release on the topic stated:

> A provision of [FACTA] will require that account numbers on credit card receipts be shortened or "truncated" so that merchants, employees, or others who may have access to the receipts do not have access to consumers' names and full credit card numbers.

Again, there is no mention of any requirement that expiration dates must be removed. (See p. 1 of Exhibit E, attached hereto).  Given the confusion surrounding FACTA, Plaintiff cannot genuinely argue that Jade knew that if would be violating the law by not removing the expiration date.  It is reasonable to read the statute as only requiring the truncation of the credit card number.

Jade cannot have willfully violated Section 1681 c(g) where its actions are consistent with a reasonable interpretation of the statute. As Section 1681 c(g) is vague and ambiguous, Jade cannot be found liable where its actions are at most a careless reading of the statute.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss with prejudice Plaintiff's Second Amended Complaint and, for such additional relief that this Court deems just and proper.

Dated: April 4, 2008          Respectfully submitted,

**Jade, LLC, and Spring Group, Inc. d/b/a Spring Restaurant and/or d/b/a Spring**


s/Gerald W. Huston
By: Gerald W. Huston, one of its attorneys

HALL PRANGLE & SCHOONVELD
200 S. Wacker Drive, Suite 3300
Chicago, IL 60606
(312) 345-9600

# Exhibit

# A

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-502-RGK (JCx) | | Date | June 11, 2007 |
|---|---|---|---|---|

| Title | TALINE SOUALIAN v. INTERNATIONAL COFFEE AND TEA LLC, et al. |
|---|---|

Present: The Honorable   R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

| Sharon L. Williams | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      (IN CHAMBERS) PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION (DE 20)

## I.   INTRODUCTION

On January 19, 2007, Plaintiff Taline Soulian ("Plaintiff") filed a class action against International Coffee & Tea, LLC ("Defendant"), under the Fair and Accurate Credit Transactions Act ("FACTA").[1] Plaintiffs' Motion for Class Certification is presently before the Court. For the reasons below, the Court denies Plaintiffs' Motion.

## II.   FACTUAL BACKGROUND

The following facts are alleged by the parties. On January 10, 2007, during a credit card transaction with one of Defendant's Coffee Bean stores, Plaintiff received an electronically-printed receipt that contained the last five digits of her credit card number and the card's expiration date. Plaintiff alleges that her receipt violates 15 U.S.C. § 1681c(g), which provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number of the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." (Comp. ¶ 2-4, *see also* 15 U.S.C. § 1681c(g)(1)).

Plaintiff filed this class action against Defendant on January 19, 2007. Under Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiff seeks to certify the class of individuals who made purchases at Defendant's stores between December 24, 2006 and January 24, 2007 and who received receipts on which Defendant printed more than the last five digits of the person's credit card or debit card number, or on which Defendant printed the expiration date of the person's credit or debit card.

---

[1] FACTA is a subset of the statutes contained within the Fair Credit Reporting Act ("FRCA"), codified at 15 U.S.C. §§ 1681, *et. seq.*

### III.    JUDICIAL STANDARD

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.*, 168 F.R.D. 643, 647 (C.D. Cal. 1996) (citing *Crown, Cork & Seal Co. v. Parking*, 462 U.S. 345 (1983)). Federal Rule of Civil Procedure 23 ("Rule 23") governs class actions. A class action "may be certified if the trial court is satisfied after a rigorous analysis, that the prerequisite of Rule 23(a) have been satisfied." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982).

To certify a class action, Plaintiffs must set forth prima facie facts that support the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Mego Fin. Corp. Sec. Litig. v. Nadler*, 213 F.3d 454, 462 (9th Cir. 2000) (internal quotations omitted). These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Falcon*, 347 U.S. at 155 (quoting *General Tel. Co. of Northwest*, 446 U.S. at 330).

If the district court finds that the action meets the prerequisites of Rule 23(a), the court must then consider whether the class is maintainable under Rule 23(b). A class is maintainable under Rule 23(b)(3) where "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members," and where "a class action is *superior* to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)). The predominance inquiry measures the relative weight of the common issues to individualized claims. *Id.* "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citing *Valentino*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests members in the class have in individually controlling the prosecution or defense of the separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Id.*

### IV.    DISCUSSION

#### A.    The Proposed Class

Plaintiffs propose a Class defined as follows: "All individuals who, on or after December 4, 2006, were provided at the point of a sale or transaction with an electronically-printed receipt by COFFEE BEAN on which COFFEE BEAN printed more than the last five digits of the person's credit card or debit card number, or on which COFFEE BEAN printed the expiration date of the person's credit or debit card." (the "Plaintiff Class"). (P. Mot. At 5).[2]

---

[2] Defendant argues that the proposed class is overbroad. Defendant asserts that Coffee Bean has not printed more than the last five digits of account numbers on receipts for several years, and Plaintiff's receipt also shows that Coffee Bean properly truncated her credit card number to only five digits. The Court need not decide this issue since it finds that certification is not proper under 23(b).

**B.    Rule 23(b)[3]**

A class action can be maintained under Rule 23(b)(3) if a court finds both that common questions of law or fact "predominate" over individual questions, and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Defendant opposes class certification on the grounds that a class action is not the superior method for the fair and efficient adjudication of the controversy. Because of the potential for a large statutory damage award, out of proportion with any harm suffered by the plaintiff, Defendant argues that the Court should deny class certification. Defendant also claims that superiority is not met because of the serious difficulty in managing and notifying all of the class members. For the following reasons, the Court agrees.

A court must find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Under Rule 23(b)(3), courts have recognized that "fairness and due process concerns make litigation by and against some parties the normal rule and litigation by or against a class the exception to the normal rule." *Legge v. Nextel Communictions, Inc.*, 2004 WL 5235587 (C.D. Cal 2004).[4]

In interpreting the superiority requirement, a Central District Court of California recently denied a plaintiff's motion for class certification. *Spikings v. Cost Plus, Inc.*, Case No. CV 06-8125-JFW (AJWx) (C.D. Cal. May 25, 2007) (order denying class certification). In *Spikings*, the court dealt with the same violations of FACTA as the instant case, and ruled that class certification was not appropriate.[5] The *Spikings* court noted that other courts, including the Ninth Circuit, have denied class certification where the defendant's liability would "constitute horrendous, possibly annihilating punishment unrelated to any damage to the purported class." *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, [PIN] (9th Cir. 1974) (citing *Ratner v. Chem Bank*, 54 F.R.D. 412, 416 (S.D.N.Y. 1972)). In these cases, the courts did not deny class certification solely because of the possible financial impact it would have on the defendant, but because of the disproportionality of the damages award in relation to the harm actually suffered by the class. *Ratner*, 54 F.R.D. at 416.[6]

Here, the facts mirror those of *Spikings*. Plaintiff alleges no actual damages, such as identity theft, as a result of her expiration date appearing on her receipt from Coffee Bean. There is no evidence that any customer making a purchase from Defendant's stores between December 4, 2006 and January 24, 2007 suffered any actual harm due to the inclusion of the expiration date on credit card and debit

---

[3] Because the Court denies Plaintiff's Motion for Class Certification for failure to satisfy the requirements of 23(b), it need not consider Rule 23(a).

[4] See also Note to Amended Rule 23, 39 F.R.D. 98, 102-103, explaining that the superiority requirement allows courts to exercise considerable discretion in deciding whether or not to certify a class for a category of cases for which a class action may not be the best method.

[5] After receiving evidence that the inclusion of the expiration date on a credit card or debit card receipt was virtually impossible to result in identity theft and any other actual harm, the lack of any actual harm suffered by members of the potential class, and considering the disastrous consequences to Defendant's business and the thousands of Defendant's employees that would be left without a job if the class was certified in the case, the court denied class certification.

[6] Other courts have likewise denied class certification due to disproportionate damages. In *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1256, 1255 n. 5 (11th Cir. 2003) (citing *Kline*, 508 F.2d 226 at [PIN]), the court held that class treatment fails to meet the "superiority requirement" where the defendant's liability "would be enormous and completely out of proportion to any harm suffered by the plaintiff. In *Ratner*, 54 F.R.D. at 416, the court held that class certification lacks superiority where a violation is technical, and aggregation of statutory damages under TILA would be financially devastating for the defendant. Similarly, in *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 341-347 (10th Cir. 1973), the court affirmed the district court's denial of class certification for TILA violations cases where class members were not harmed and aggregate of statutory damages would be extremely large.

card receipts.[7] Furthermore, it appears virtually impossible for the inclusion of the expiration date on a credit card or debit card receipt to result in identity theft or any other actual harm. Declaration of Mari J. Frank, ¶ 4, 8-18.

If Plaintiff is able to prove that Defendant committed a "willful" violation of FACTA, each class member would be eligible to receive between $100 and $1,000 in statutory damages. If the class is certified, Defendant faces statutory damages alone of between approximately $4.8 million and $48 million. (Def. Motion at 1). Given the disproportionate consequences to Defendant's business and the lack of any actual harm suffered by members of the potential class, the Court finds that Plaintiff fails to meet the superiority requirement.[8]

Furthermore, as soon as becoming aware that having the expiration date on credit card and debit card receipts was a technical violation of FACTA, Defendant investigated and removed the expiration dates on the receipts distributed in all of its Coffee Bean locations within two days. Defendant's immediate action to comply with FACTA's requirements once becoming aware of this action also supports denial of class certification. *Spikings v. Cost Plus, Inc.*, Case No. CV 06-8125-JFW (AJWx) (C.D. Cal. May 25, 2007) (order denying class certification).[9] Courts have recognized deterrence as a public policy objective of class action treatment. *Abels v. JBC Legal Group, P.C.*, 227 F.R.D. 541 (2005) (quoting H. Newberg, *Class Actions* § 4.36 (4th ed. 2005)) (recognizing that class actions "were designed not only to compensate victimized members of groups who are similarly situated...but also deter violations of the law"). By immediately remedying their misconduct upon receiving Plaintiff's Complaint, Defendants demonstrated good faith and nullified any deterrence benefit that might have been derived from a class action.

Therefore, the Court finds that the superiority requirement has not been met. Where massive damage awards would be disproportionate to any actual damage caused by the alleged violations, class action is not the superior method of adjudicating class members' claims. Denial of class certification in this case does not prevent any of the Defendant's customers seeking statutory and punitive damages, or those who may have suffered actual damages as a result of Defendant's conduct, from proceeding with individual cases to recover those damages. Nor is class action treatment the only means of ensuring that Defendant can be held accountable for violations of FACTA. *Spikings*, Case No. CV 06-8125-JFW (AJWx).

---

[7] Although the court should not judge the ultimate merits of the case at the class certification stage, it may consider evidence relating to the merits if such evidence also goes the requirements of Rule 23. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

[8] Plaintiff contests that, under *Murray v. GMAC*, 434 F.3d 948, 953 (7th Cir. 2001), which was followed by a California district court in *White v. E-Loan*, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006), the potential of "annihilating" statutory damages should not preclude class action treatment. However, the *White* court distinguished itself from *Ratner* and *Kline* on the ground that the defendant was not accused of a mere technical violation. Further, while the Seventh Circuit in *Murray* failed to adopt the *Ratner's* reasoning, the Ninth Circuit in *Kline* specifically follows *Ratner*.

[9] See also *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1377 (11th Cir. 1984), where a technical violation of TILA had prompted the defendant's vice president to immediately discontinue using the forms at issue, the court upheld the district court's denial of class certification. The *Shroder* court noted that "although technical violations of the complex TILA disclosure requirements are sufficient to establish a cause of action, the purpose of the Act is to insure compliance by creditors and not to punish an unwary violator." *Id.*

IV.    **CONCLUSION**

For all the foregoing reasons, Plaintiff has failed to satisfy Rule 23(b)(3). Accordingly, the Court **DENIES** Plaintiff's Motion.

**IT IS SO ORDERED.**

SCANNED

Initials of Preparer _____ s/w

# Exhibit

# B

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

```
ENTERED
CLERK, U.S. DISTRICT COURT

MAY 2 9 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY
```

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

PRIORITY SEND
*Rept*

Case No.   **CV 06-8125-JFW (AJWx)**                    Date: May 25, 2007

Title:    Katherine E. Spikings v. Cost Plus, Inc.

---

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

Shannon Reilly                           None Present
Courtroom Deputy                         Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**    **ATTORNEYS PRESENT FOR DEFENDANTS:**
              None                                      None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER DENYING PLAINTIFF'S MOTION FOR CLASS
                                   CERTIFICATION PURSUANT TO FRCP 23 [filed 4/3/07;
                                   Docket No. 19]**

    On April 3, 2007, Plaintiff Katherine E. Spikings ("Plaintiff") filed a Motion For Class
Certification Pursuant to FRCP 23 ("Motion"). On April 30, 2007, Defendant Cost Plus, Inc.
("Defendant") filed its Opposition. On May 7, 2007, Plaintiff filed a Reply. Pursuant to Rule 78 of
the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found that this matter was
appropriate for decision without oral argument. Accordingly, the hearing calendared for May 14,
2007, was vacated and the matter taken off calendar. After considering the moving, opposing,
and reply papers and the arguments therein, the Court rules as follows:

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

    The instant case was filed as a putative class action by Plaintiff against Defendant. Plaintiff
contends that Defendant violated the Fair and Accurate Transactions Act ("FACTA")[1] by printing
the last four digits of Plaintiff's credit card number *and* the credit card expiration date on Plaintiff's
receipt for her purchase at one of Defendant's stores in Los Angeles on December 19, 2006.[2]

---

    [1] FACTA is a subset of the statutes contained within the Fair Credit Reporting Act
("FCRA"), codified at 15 U.S.C. § 1681, *et seq.* The FACTA requirements regarding credit card
and debit card truncation became effective on December 4, 2006.

    [2] Plaintiff also is the plaintiff in a putative class action against Bristol Farms in which she
alleges violations of FACTA and is represented by the same counsel as in this case. *See,
Katherine E. Spikings v. Bristol Farms*, Case No. CV 06-8205 DDP (RZx).

Initials of Deputy Clerk

Plaintiff asserts that this constitutes a willful violation of FACTA, which states: "[n]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g) (emphasis added). Because Plaintiff has alleged a "willful" violation of FACTA, Plaintiff seeks statutory damages of not less than $100 and not more than $1,000, as well as punitive damages and attorney's fees. See 15 U.S.C. § 1681n.

Plaintiff moves for class certification under Federal Rule of Civil Procedure 23 and for Katherine E. Spikings to be appointed as class representative. The plaintiff class consists of:

> All persons in the United States to whom, on or after December 4, 2006, Defendant provided an electronically printed receipt at the point of a sale or transaction on which Defendant printed more than the last five digits of the person's credit card or debit card number and/or printed the expiration date of the person's credit or debit card (the "Plaintiff Class"). Excluded from the Plaintiff Class are Defendant and its directors, officers and employees.

Motion at 4:12-18; Complaint at ¶¶ 14-15. Plaintiff made a purchase with a credit card at one of Defendant's Los Angeles, California, stores on December 19, 2006, at 3:44 p.m. Deposition of Katherine E. Spikings ("Spikings Depo.") at 12:1-14; Exh. 1. Less than four business hours later, at 11:30 a.m. on December 20, 2006, Plaintiff filed her Complaint. The Complaint was served on Defendant on December 28, 2006. By January 11, 2007, Defendant had implemented a change to delete the expiration date from credit card and debit card receipts.[3] March Decl. at ¶ 5; Declaration of Tom Willardson ("Willardson Decl.") at ¶ 3. The change implemented by Defendant deleted the expiration date from credit card and debit card receipts at all but three of Defendant's stores as of January 11, 2007, and the expiration date on credit card and debit card receipts at those three remaining stores was deleted on or before January 29, 2007. Id.

## II.   LEGAL STANDARD

The party seeking to certify a class bears the burden of formulating a sufficiently concise class definition, and demonstrating that the class meets the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Zinser v. Accufix Research Institute, Inc.; 253 F.3d 1180, 1186 (9th Cir. 2001), as amended, 273 F.3d 1266 (9th Cir. 2001). See also, Metcalf v. Edelman, 64 F.R.D. 407, 409-10 (N.D. Ill. 1974) (stating "[a] class must be capable of concise and exact definition."). Under Rule 23(a), a class action is only proper if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a). While Rule 23(b) provides for the maintenance of several different types of class actions, Plaintiff in this case is moving under Rule 23(b)(3), which allows a class to be certified if a court finds both that common questions of law or fact "predominate" over individual questions and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Failure to carry this burden

---

[3] Defendant has truncated credit card and debit card numbers on all receipts since May 2000. Declaration of Cliff March ("March Decl."), ¶ 2.



Initials of Deputy Clerk _si_

precludes the party from maintaining its complaint as a class action. *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

In order to obtain class certification, the party must provide facts to satisfy these requirements: simply repeating the language of the rules in its moving papers is insufficient. *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977). A district court must conduct a "rigorous analysis" of the moving party's claims to examine whether the requirements of Rule 23 are met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982). Although the court should not judge the ultimate merits of the case at the class certification stage, it may consider evidence relating to the merits if such evidence also goes to the requirements of Rule 23. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

## III.    DISCUSSION

In this case, Plaintiff cannot satisfy Rule 23(b)(3), which allows a class to be certified if a court finds both that common questions of law or fact "predominate" over individual question and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement is unique to those class actions maintained under Rule 23(b)(3)." *Kamm v. California City Development Company*, 509 F.2d 205 (9th Cir. 1975). As the Advisory Committee explained in its Note to Amended Rule 23, the superiority requirement allows the Court to exercise its considerable discretion in deciding whether or not to certify a class for a category of cases for which a class action may not be the best method:

> In the situations to which this subdivision ((b)(3)) relates, class-action treatment is not as clearly called for as in those described above, (i.e. (b)(1) and (b)(2)), but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

Note to Amended Rule 23, 39 F.R.D. 98, 102-03; *see also, Ratner v. Chemical Bank New Trust Co.*, 54 F.R.D. 412, 416 (S.D.N.Y.1972) ("Students of [Rule 23] have been led generally to recognize that its broad and open-ended terms call for the exercise of some considerable discretion of a pragmatic nature."); *Legge v. Nextel Comm., Inc.*, 2004 WL 5235587 (C.D. Cal. June 28, 2004) ("Courts bear a significant responsibility to insure that the great power wielded by plaintiffs (or more accurately their counsel) carrying the cudgel of a class action is used only in appropriate cases.").

In applying Rule 23(b)(3), many courts have denied class certification on the grounds that class treatment fails to meet the "superiority" requirement where the defendant's liability "would be enormous and completely out of proportion to any harm suffered by the plaintiff." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n. 5 (11th Cir.2003) (*citing Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir.1974)). In these cases, certification is not denied solely because of the possible financial impact it would have on a defendant, but based on the disproportionality of a damage award that has little relation to the harm actually suffered by the class, and on the due

Initials of Deputy Clerk _sr_

process concerns attendant upon such an impact. *See, e.g., Ratner,* 54 F.R.D. at 416 (denying class certification where TILA's minimum award of $100 each for some 130,000 class members would be a "horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant"). The first of these cases involved the Truth in Lending Act ("TILA").[4]  *See, e.g., Ratner,* 54 F.R.D. 412; *Shields v. First Nat'l Bank of Ariz.,* 56 F.R.D. 442 (D. Ariz. 1972) (declining to certify class of 72,000 that sought $100 million in statutory damages); *Alsup v. Montgomery Ward & Co.,* 57 F.R.D. 89 (N.D. Cal. 1972) (denying certification in TILA case seeking $20 million in statutory damages for one class and $8 billion for another); *Rodriguez v. Family Publications Service, Inc.,* 57 F.R.D. 189 (C.D. Cal. 1972) (denying class treatment under TILA where the defendant faced over $25 million in statutory damages); *Mathews v. Book-of-The-Month Club, Inc.,* 62 F.R.D. 479 (N.D. Cal. 1974) (denying class certification where minimum statutory penalties under TILA would have been $50 million); *Wilcox v. Commerce Bank,* 474 F.2d 336 (10th Cir. 1973) (finding trial court did not abuse discretion is declining to certify class).

Other courts have relied on the same logic in denying class certification where the damages would be "ad absurdum." *See, e.g., London,* 340 F.3d at 1255 n. 5; *Forman v. Data Transfer,* 164 F.R.D. 400 (E.D. Pa.1995) ("A class action would be inconsistent with the specific and personal remedy provided by Congress to address the minor nuisance of unsolicited facsimile advertisements."); *Wilson v. American Cablevision of Kansas City,* 133 F.R.D. 573, 578 (W.D. Mo. 1990). In addition, some courts have denied class certification in FCRA cases where the damages that would be imposed on the defendant would be out of relation to the harm suffered by the plaintiff. *See, e.g., Legge,* 2004 WL 5235587 (C.D. Cal. June 28, 2004) (declining to certify class action where, due to the size of the class, even minimal damages would impose "super penalties" on the defendant in relation to the harm suffered).

In this case, if a class is certified and Plaintiff prevails, even the minimum statutory damages would be ruinous to Defendant. The class as defined by Plaintiff in this case would include approximately 3.4 million people nationwide who made purchases with credit cards or debit cards between December 4, 2006, when the FACTA truncation requirements went into effect, and January 11, 2007, when Defendant implemented a change to delete the expiration date from credit card and debit card receipts. If Plaintiff is able to prove that Defendant committed a "willful" violation of FACTA, each class member would be eligible to receive between $100 and $1,000 in statutory damages. For a class of 3.4 million people, statutory damages alone would range from a *minimum* of $340 million to a maximum of $3.4 billion. Defendant's entire net worth is approximately $316 million, with net sales revenues for fiscal year 2005 of approximately $20 million. Willardson Decl. at ¶ 2. Thus, an award of even the minimum statutory damages of $340 million would put Defendant out of business.

---

[4]  While it appears that the Ninth Circuit has never explicitly addressed the issue of FACTA statutory damages in class action lawsuits that is at issue in this case, it has cited favorably to these TILA cases. *See, e.g., Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir.1974) (relying on TILA cases to deny class certification, and holding that a class action was not a superior method of adjudicating the controversy because "[a]t some point the logic of the law leads in this situation to an ad absurdum result."). Moreover, while TILA has been amended to include a cap on statutory damages, the rationale of the TILA cases decided prior to the inclusion of a cap on statutory damages still applies to FACTA cases because there currently is no cap on statutory damages under FACTA.

Initials of Deputy Clerk __sr__

In addition, Plaintiff has testified that she did not suffer any actual damage, such as identity theft, as a result of her expiration date appearing on her credit card receipt from Defendant's store, and there is no evidence that any customer making a purchase from Defendant's store between December 4, 2006, and January 11, 2007 suffered any actual harm due to the inclusion of the expiration date on credit card and debit card receipts. Spikings Depo., 17:24-19:3; 21:23-25. Furthermore, it appears unlikely, if not impossible, for the inclusion of the expiration date on a credit card or debit card receipt to result in identity theft or any other actual harm. Declaration of Mari J. Frank, ¶ 9.[5] Given the disastrous consequences to Defendant's business and the thousands of Defendant's employees that would be left without a job if a class is certified in this case and the lack of any actual harm suffered by members of the potential class, the Court find that certification of a class would be inappropriate in this case.

Moreover, as soon as becoming aware that having the expiration date on credit card and debit card receipts may have been a technical violation of FACTA, Defendant promptly began the process of removing the expiration date from these receipts, and had removed the expiration receipt from all its stores' credit card and debit card receipts within one month. Defendant's immediate action to comply with FACTA's requirements once becoming aware of Plaintiff's Complaint also supports denial of class certification in this case. For example, in *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1377 (11th Cir. 1984), the Eleventh Circuit upheld the district court's denial of class certification where the disclosure statement at issued technically violated TILA but the defendant's vice president testified that subsequent to the filing of the lawsuit, defendant had discontinued using the forms about which the plaintiff had complained and was having all its forms reevaluated by its attorneys. In upholding the denial of the class certification, the Eleventh Circuit found that "although technical violations of the complex TILA disclosure requirements are sufficient to establish the cause of action, the purpose of the Act is to insure compliance by creditors and not to punish an unwary violator." *Id.; see also, Wilson*, 133 F.R.D. 573 (denying class certification where notice that allegedly was in violation of the Cable Communications Act had been amended prior to filing of motion for class certification).

More importantly, denial of class certification in this case does not prevent any of Defendant's customers who may have suffered actual damages as a result of Defendant's conduct from proceeding with individual cases to recover those damages. Likewise, any individual who feels that his rights under FACTA have been violated but who has not suffered any actual harm can, as Plaintiff has, file a lawsuit to recover statutory damages and, if successful, attorney's fees. *See* 15 U.S.C. § 1681n. Therefore, a class action is not the only means of ensuring that Defendant can be held accountable for violations of FACTA. Thus, some of the concerns that

---

[5] Plaintiff objects to paragraph 9 of Ms. Frank's declaration as "[i]rrelevant (FRE, Rule 402), improper argument of the merits in a purely procedural motion, and improper legal argument outside of party's memorandum of points and authorities, in circumvention of the page limit on party's brief." Plaintiff's Objections to Defendant's Declarations Submitted in Support of Opposition to Class Certification, Exh. 1 at 7:17-20. However, "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3rd Cir. 2001). Accordingly, Plaintiff's objections are overruled.

Initials of Deputy Clerk _sr_

might favor certification in other consumer protection schemes that do not provide for the recovery of statutory damages or attorney's fees are not present here.

Finally, as other courts have found, a class action would not be the superior method for the fair and efficient adjudication of the controversy in a case such as this one because it could possibly open the potential for abuse by the attorneys in such a class action. For example, in *Buford v. American Finance Co.*, 333 F.Supp. 1243, 1251 (N.D. Ga. 1971), the court stated "the plain truth is that in many cases Rule 23(b)(3) is being used as a device for the solicitation of litigation. This is clearly an 'undesirable result' which cannot be tolerated." *See also, Shields*, 56 F.R.D. at 451 (holding that allowing a class action under TILA "could be the means of curing an illness by killing the patient and in the process promoting unnecessary litigation mainly for the benefit of a few lawyers ready and willing to promote such cases"). While the Court does not express an opinion on the propriety of the conduct of Plaintiff's counsel in this case, the Court agrees that such a potential for abuse is an additional reason why maintenance of a class action is not superior to individual actions under FACTA in cases such as this one where there is an enormous contrast between the huge liability suffered by Defendant and the lack of harm suffered by Plaintiff.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff has failed to satisfy Rule 23(b)(3). Accordingly, the Court **DENIES** Plaintiff's Motion.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

Initials of Deputy Clerk __sr__

# Exhibit
# C



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

 CLICK HERE TO PRINT

For Immediate Release
December 4, 2003

## Fact Sheet: President Bush Signs the Fair and Accurate Credit Transactions Act of 2003

On December 4, 2003, President Bush signed into law the Fair and Accurate Credit Transactions Act of 2003, ensuring that all citizens are treated fairly when they apply for a mortgage or other form of credit.

The legislation will provide consumers, companies, consumer reporting agencies, and regulators with important new tools that expand access to credit and other financial services for all Americans, enhance the accuracy of consumers' financial information, and help fight identity theft. These reforms make permanent the uniform national standards of our credit markets, and institute new, strong consumer protections.

**Background**

The Fair and Accurate Credit Transactions Act of 2003 will accomplish the following key Administration priorities to help ensure that all Americans, of every income level and background, are able to build good credit and confront the problem of identity theft:

- Ensuring that lenders make decisions on loans based on full and fair credit histories, and not on discriminatory stereotypes. In 1996, uniform national standards were established to set clear rules on what credit agencies were entitled to include in individual credit reports, and now more than a million Americans have credit as a result. This legislation makes those national standards permanent.

- Improving the quality of credit information, and protecting consumers against identity theft.

    o Giving every consumer the right to their credit report free of charge every year. Consumers will be able to review a free report every year for unauthorized activity, including activity that might be the result of identity theft.

    o Helping prevent identity theft before it occurs by requiring merchants to leave all but the last five digits of a credit card number off store receipts. This law will make sure that slips of paper that most people throw away do not contain their credit card number, a key to their financial identities.

    o Creating a national system of fraud detection to make identity thieves more likely to be caught. Previously, victims would have to make phone calls to all of their credit card companies and three major credit rating agencies to alert them to the crime. Now consumers will only need to make one call to receive advice, set off a nationwide fraud alert, and protect their credit standing.

    o Establishing a nationwide system of fraud alerts for consumers to place on their credit files. Credit reporting agencies that receive such alerts from customers will now be obliged to follow procedures to ensure that any future requests are by the true consumer, not an identity thief posing as the consumer. The law also will enable active duty military personnel to place special alerts on their files when they are deployed overseas.

    o Requiring regulators to devise a list of red flag indicators of identity theft, drawn from the patterns and practices of identity thieves. Regulators will be required to evaluate the use of these red flag indicators in their compliance examinations of financial institutions, and impose fines where disregard of red flags has resulted in losses to customers.

    o Requiring lenders and credit agencies to take action before a victim even knows a crime has

Fact Sheet: President Bush Signs the Fair and Accurate Credit Transactions Act of 2003        Page 2 of 2

occurred. With oversight by bank regulators, the credit agencies will draw up a set of guidelines to identify patterns common to identity theft, and develop methods to stop identity theft before it can cause major damage.

This legislation gives consumers unprecedented tools to fight identity theft and continued access to the most dynamic credit markets in the world. With a free credit report and powerful new tools to fight fraud, consumers have the ability to better protect themselves and their families.

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2003/12/20031204-3.html

CLICK HERE TO PRINT

# Exhibit
# D

PREPARED STATEMENT OF

THE FEDERAL TRADE COMMISSION ON

IDENTITY THEFT AND SOCIAL SECURITY NUMBERS


Before the

SUBCOMMITTEE ON SOCIAL SECURITY

of the

HOUSE COMMITTEE ON WAYS AND MEANS

.


Washington, DC

June 15, 2004

## I.     INTRODUCTION

Mr. Chairman, and members of the Subcommittee, I am J. Howard Beales, III, Director of the Bureau of Consumer Protection, Federal Trade Commission ("FTC" or "Commission").[1]  I appreciate the opportunity to present the Commission's views on identity theft and Social Security numbers.  The Federal Trade Commission has a broad mandate to protect consumers, and controlling identity theft is an important issue of concern to all consumers.  Through this testimony, the Commission will describe the results of a recent survey on the prevalence and impact of identity theft, the ways in which Social Security numbers are collected and used, new protections for consumers and identity theft victims, and the Commission's identity theft program.

## II.     UNDERSTANDING THE IMPACT OF IDENTITY THEFT

On November 1, 1999, the Commission began collecting identity theft complaints from consumers in its national database, the Identity Theft Data Clearinghouse (the "Clearinghouse").[2]  Every year since has seen an increase in complaints.[3]  The Clearinghouse now contains over 600,000 identity theft complaints taken from victims across the country.  By itself, though, these self-reported data do not currently allow the FTC to draw any firm conclusions about the incidence of identity theft in the general population.  To address this important issue, the FTC

---

[1] The views expressed in this statement represent the views of the Commission.  My oral presentation and responses to questions are my own and do not necessarily represent the views of the Commission or any Commissioner.

[2] *See infra* Section V for a discussion of the Commission's mandate to maintain an identity theft complaint database pursuant to the 1998 Identity Theft Assumption and Deterrence Act.

[3] Charts that summarize data from the Clearinghouse can be found at http://www.consumer.gov/idtheft/stats.html and http://www.consumer.gov/sentinel/index.html.

1

commissioned a survey last year to gain a better picture of the incidence of identity theft and the impact of the crime on its victims.[4] The results were startling. The data showed that within the 12 months preceding the survey, 3.23 million persons discovered that an identity thief opened new accounts in their names. An additional 6.6 million consumers learned of the misuse of an existing account. Overall, nearly 10 million people – or 4.6 percent of the adult population – discovered that they were victims of some form of identity theft. These numbers translate to nearly $48 billion in losses to businesses, nearly $5 billion in losses to individual victims, and almost 300 million hours spent by victims trying to resolve their problems.

Moreover, identity theft is a growing crime. The survey indicated a significant increase in the previous 2-3 years - - nearly a doubling from one year to the next, although the research showed that this increase has recently slowed. Notably, this recent increase primarily involved the misuse of an existing account, which tends to cause less economic injury to victims and is generally easier for them to identify and fix. Overall, the 2003 survey analysis puts the incidence rates of identity theft into sharper focus, and demonstrates the need for a concerted effort between the public and private sectors to act aggressively to reduce identity theft.

## III.    SOCIAL SECURITY NUMBER USES AND IDENTITY THEFT

Social Security numbers play a pivotal role in identity theft. Identity thieves use the Social Security number as a key to access the financial benefits available to their victims. Preventing identity thieves from obtaining Social Security numbers will help to protect consumers from this pernicious crime. The potential for misuse arises because Social Security numbers are crucial to

---

[4] The research took place during March and April 2003. It was conducted by Synovate, a private research firm, and involved a random sample telephone survey of over 4,000 U.S. adults. The full report of the survey can be found at http://www.consumer.gov/idtheft/stats.html.

the proper functioning of our financial system. Social Security numbers are used to match consumers to their credit and other financial information. Without them, information may be attributed to the wrong consumer, and the accuracy of credit reports may be degraded. Enabling Social Security numbers to be used appropriately will help to ensure that consumers continue to enjoy the benefits of our current credit system. The Commission is studying "the efficacy of increasing the number of points of identifying information that a credit reporting agency is required to match to ensure that a consumer is the correct individual to whom a consumer report relates before releasing a consumer report to a user" as required by the Fair and Accurate Credit Transactions Act of 2003.[5] This study, to be completed by December, 2004, should greatly increase our knowledge of the importance of Social Security numbers in the matching process. The Commission looks forward to reporting its findings to Congress.

Social Security numbers are collected by public and private entities for various purposes, and several federal and state laws restrict the use or disclosure of Social Security numbers, depending on the source.[6] The nationwide credit bureaus are primary private sources of Social

---

[5]Pub. L. No. 108-396, § 318 (2003).

[6]As GAO has reported, government and commercial entities use social security numbers for a number of different purposes, including to verify the eligibility of applicants, manage records, and conduct research. U.S. General Accounting Office, *Social Security: Government and Commercial Use of the Social Security Number is Widespread*, GAO/HEHS-99-28 (Washington, D.C.: Feb 16, 1999) and *Social Security Numbers: Government Benefits from SSN Use but Could Provide Better Safeguards*, GAO-02-352 (Washington, D.C.: May 31, 2002). As examined in GAO's most recent report of January 2004, information resellers, consumer reporting agencies, and health care organizations obtain social security numbers both directly from consumers and other businesses, and the entities use them for various purposes, including identification and to match the consumer to information stored in the consumer's credit report. *See* U.S. General Accounting Office, *Social Security Numbers: Private Sector Entities Routinely Obtain and Use SSNs and Laws Limit the Disclosure of This Information*, GAO-04-11 (Washington, D.C.: Jan. 22, 2004).

3

Security numbers, collecting information from financial institutions for credit reporting purposes. This information typically includes a consumer's identifying information – such as name, address, and Social Security number – as well as information related to the consumer's credit accounts. The identifying information collected by the credit bureaus is one of the most reliable and comprehensive sources of this information, because individuals tend to provide their financial institutions with accurate and up-to-date identifying information and the credit bureau databases contain information for over 200 million consumers.[7]

The Gramm-Leach-Bliley Act ("GLBA")[8] imposes certain restrictions on the reuse and redisclosure of the identifying information – including Social Security numbers – that is collected by credit bureaus from financial institutions.[9] As a general matter, the GLBA prohibits financial institutions from disclosing nonpublic personal information ("NPI") to nonaffiliated third parties without first providing consumers with notice and the opportunity to opt out of such disclosure. This general restriction, however, is subject to certain exceptions. The information may flow from financial institutions to others for certain purposes specified in the statute and rule,

---

[7]*See* Consumer Data Industry Association's Web site, *available at* http://www.cdiaonline.org/about.cfm.

[8]Subtitle A of Title 5 of the GLBA, 15 U.S.C. §§ 6801-6809.

[9]The GLBA applies to any "nonpublic personal information" ("NPI") that a financial institution collects about an individual in connection with providing a financial product or service to an individual, unless that information is otherwise publicly available. This includes basic identifying information about individuals, such as name, Social Security number, address, telephone number, mother's maiden name, and prior addresses. *See, e.g.,* 65 Fed. Reg. 33,646, 33680 (May 24, 2000) (the FTC's Privacy Rule). This identifying information generally is not covered by the Fair Credit Reporting Act. *See FTC v. Trans Union,* Dkt. 9255, Op. of the Commission at pp. 30-31 (Mar. 1, 2000) (holding that consumer name, Social Security number, address, telephone number, and mother's maiden name do not constitute a consumer report under the FCRA).

4

including, for example, to process transactions or to report consumer information to credit bureaus.[10]  When information is disclosed under these GLBA exceptions, the recipient may not use or disclose that NPI except "in the ordinary course of business to carry out the activity covered by the exception under which . . . the information [was received]."[11]

## IV.    NEW PROTECTIONS FOR IDENTITY THEFT VICTIMS

On December 4, 2003, the Fair and Accurate Credit Transactions Act of 2003 ("FACTA") was enacted.[12]  Many of the provisions amend the Fair Credit Reporting Act ("FCRA"),[13] and provide new and important measures to prevent identity theft and facilitate identity theft victims' recovery. Some of these measures will take effect this year.[14]  They will codify many of the voluntary measures initiated by the private sector and improve other recovery procedures already in place.

---

[10] These exceptions are found in § 502(e) of the GLBA, and in §§ 313.14 and 313.15 of the FTC's privacy rule.  The other GLBA privacy rules contain substantially similar provisions.  The § 313.14 exceptions relate to the processing and servicing of transactions at the consumer's request, and the § 313.15 exceptions contain a broad range of unrelated exceptions, such as preventing fraud, assisting law enforcement, complying with subpoenas, and reporting to credit bureaus.  Section 313.13 also contains an exception to the notice and opt out requirement, but that section is not relevant here because it relates to contractual arrangements with service providers and joint marketers.

[11] 16 C.F.R. 313.11(a)(1)(iii), (c)(3) (2000).

[12] Pub. L. No. 108-396 (2003) (codified at 15 U.S.C. § 1681 *et seq.*).

[13] 15 U.S.C. § 1681 *et seq.*

[14] The statute set effective dates for certain sections and required the Commission and the Federal Reserve Board jointly to set effective dates for the remaining sections. *See* Effective Dates for the Fair and Accurate Credit Transactions Act of 2003, 16 C.F.R. § 602.1 (2004).

One prominent benefit of these amendments to the FCRA is the greater access to free consumer reports.[15] Previously under the FCRA, consumers were entitled to a free consumer report only under limited circumstances.[16] Beginning in December of this year with a regional rollout, nationwide and nationwide specialty consumer reporting agencies[17] must provide free credit reports to consumers once annually, upon request.[18] Free reports will enhance consumers' ability to discover and correct errors, thereby improving the accuracy of the system, and also enable consumers to detect identity theft early.

Other measures that act to prevent identity theft include:

- *National fraud alert system:*[19] Consumers who reasonably suspect they have been or may be victimized by identity theft, or who are military personnel on active duty away from home,[20] can place an alert on their credit files. The alert will put

---

[15]Pub. L. No. 108-396, § 211 (2003).

[16]Previously, free reports were available only pursuant to the FCRA when the consumer suffered adverse action, believed that fraudulent information may be in his or her credit file, was unemployed, or was on welfare. Absent one of these exceptions, consumers had to pay a statutory "reasonable charge" for a file disclosure; this fee is set each year by the Commission and is currently $9. *See* 15 U.S.C. § 1681j. In addition, a small number of states required the CRAs to provide free annual reports to consumers at their request.

[17]Section 603(w) of the FCRA defines a "nationwide specialty consumer reporting agency" as a consumer reporting agency that compiles and maintains files on consumers relating to medical records or payments, residential or tenant history, check writing history, employment history, or insurance claims, on a nationwide basis. 15 U.S.C. § 1681a(w).

[18]*See* Free Annual File Disclosures, 16 C.F.R. §§ 610.1 and 698.1 (2004).

[19]Pub. L. No. 108-396, § 112 (2003).

[20]The Commission is developing a rule on the duration of this active duty alert. *See* Related Identity Theft Definitions, Duration of Active Duty Alerts, and Appropriate Proof of Identity Under the Fair Credit Reporting Act, 69 Fed. Reg. 23370, 23372 (April 28, 2004) (to be
(continued...)

6

potential creditors on notice that they must proceed with caution when granting credit in the consumer's name. The provision also codified and standardized the "joint fraud alert" initiative administered by the three major credit reporting agencies. After receiving a request from an identity theft victim for the placement of a fraud alert on his or her consumer report and for a copy of that report, each credit reporting agency now shares that request with the other two nationwide credit reporting agencies, thereby eliminating the need for the victim to contact each of the three agencies separately.

- *Truncation of credit and debit card receipts:*[21] In some instances, identity theft results from thieves obtaining access to account numbers on credit card receipts. FACTA seeks to reduce this source of fraud by requiring merchants to truncate the full card number on electronic receipts. The use of truncation technology is becoming widespread, and some card issuers already require merchants to truncate.[22]

- *"Red flag" indicators of identity theft:*[23] The banking regulators and the FTC will jointly develop a rule to identify and maintain a list of "red flag" indicators of identity theft. The goal of this provision is for financial institutions and creditors

---

[20](...continued)
codified at 16 C.F.R. pt. 613).

[21]Pub. L. No. 108-396, § 113 (2003).

[22]FACTA creates a phase-in period to allow for the replacement of existing equipment.

[23]*Id.* § 114.

7

to analyze identity theft patterns and practices so that they can take appropriate action to prevent this crime.

- *Disposal of Consumer Report Information and Records:*[24] The banking regulators and the FTC are coordinating a rulemaking to require proper disposal of consumer information derived from consumer reports.[25] This requirement will help to ensure that sensitive consumer information, including Social Security numbers, is not simply left in a trash dumpster, for instance, once a business no longer needs the information.[26]

FACTA also includes measures that will assist victims with their recovery. These provisions include:

- *Identity theft account blocking:*[27] This provision requires credit reporting agencies immediately to cease reporting, or block, allegedly fraudulent account information on consumer reports when the consumer submits an identity theft report,[28] unless there is reason to believe the report is false. Blocking would mitigate the harm to consumers' credit records that can result from identity theft. Credit reporting

---

[24]*Id.* § 216.

[25]Disposal of Consumer Report Information and Records, 69 Fed. Reg. 21388 (April 20, 2004) (to be codified at 16 C.F.R. pt. 682).

[26]In its outreach materials, the FTC also advises consumers to shred any sensitive information before disposing of it.

[27] Pub. L. No. 108-396, § 152 (2003).

[28]The Commission is developing a rule to define the term "identity theft report." *See* Related Identity Theft Definitions, Duration of Active Duty Alerts, and Appropriate Proof of Identity Under the Fair Credit Reporting Act, 69 Fed. Reg. 23370, 23371 (April 28, 2004) (to be codified at 16 C.F.R. pt. 603).

agencies must also notify information furnishers who must then cease furnishing the fraudulent information and may not sell, transfer, or place for collection the debt resulting from the identity theft.

- *Information available to victims:*[29] A creditor or other business must give victims copies of applications and business records relating to the theft of their identity at the victim's request. This information can assist victims in proving that they are, in fact, victims. For example, they may be better able to prove that the signature on the application is not their signature.

- *Prevention of re-reporting fraudulent information:*[30] Consumers can provide identity theft reports directly to creditors or other information furnishers to prevent them from continuing to furnish fraudulent information resulting from identity theft to the credit reporting agencies.

When fully implemented, these provisions should help to reduce the incidence of identity theft, and help victims recover when the problem does occur.

---

[29]Pub. L. No. 108-396, § 151 (2003).

[30]*Id.* § 154.

9

## V.    THE FEDERAL TRADE COMMISSION'S ROLE IN COMBATING IDENTITY THEFT

The FTC's role in combating identity theft derives from the 1998 Identity Theft Assumption and Deterrence Act ("the Identity Theft Act" or "the Act").[31]  The Identity Theft Act strengthened the criminal laws governing identity theft[32] and focused on consumers as victims.[33] The Act directed the Federal Trade Commission to establish the federal government's central repository for identity theft complaints, to make available and to refer these complaints to law enforcement for their investigations, and to provide victim assistance and consumer education. Thus, the FTC's role under the Act is primarily one of facilitating information sharing among public and private entities.[34]

---

[31]Pub. L. No. 105-318, 112 Stat. 3007 (1998) (codified at 18 U.S.C. § 1028).

[32]18 U.S.C. § 1028(a)(7) made identity theft a crime by focusing on the unlawful use of an individual's "means of identification," which broadly includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including, among other things, name, address, social security number, driver's license number, biometric data, access devices (i.e., credit cards), electronic identification number or routing code, and telecommunication identifying information.

[33]Because individual consumers' financial liability is often limited, prior to the passage of the Act, financial institutions, rather than individuals, tended to be viewed as the primary victims of identity theft.  Setting up an assistance process for consumer victims is consistent with one of the Act's stated goals:  to recognize the individual victims of identity theft.  See S. Rep. No. 105-274, at 4 (1998).

[34]Most identity theft cases are best addressed through criminal prosecution.  The FTC itself has no direct criminal law enforcement authority.  Under its civil law enforcement authority provided by Section 5 of the FTC Act, the Commission may, in appropriate cases, bring actions to stop practices that involve or facilitate identity theft.  See, e.g., FTC v. Corporate Marketing Solutions, Inc., CIV - 02 1256 PHX RCB (D. Ariz Feb. 3, 2003) (final order) (defendants "pretexted" personal information from consumers and engaged in unauthorized billing of consumers' credit cards) and FTC v. C.J., CIV - 03 5275 GHK (RZx) (C. D. Cal. July 24, 2003) (final order);  FTC v. Hill, CV-H-03-5537 (S.D. Tex. Dec. 3, 2003) (final order); and

(continued...)

10

To fulfill the Act's mandate, the Commission implemented a program that focuses on three principal components: (1) collecting complaints and providing victim assistance through a telephone hotline and a dedicated website, (2) maintaining and promoting the Clearinghouse, a centralized database of victim complaints that serves as an investigative tool for law enforcement, and (3) outreach and education to consumers, law enforcement, and private industry.

**A.    Assisting Identity Theft Victims**

The Commission takes complaints from victims through a toll-free hotline, 1-877-ID THEFT (438-4338),[35] and a secure online complaint form on its website, www.consumer.gov/idtheft. In addition, the FTC provides advice on recovery from identity theft. Callers to the hotline receive telephone counseling from specially trained personnel who provide general information about identity theft and help guide victims through the steps needed to resolve the problems resulting from the misuse of their identities.[36] Victims are currently advised to:[37] (1)

---

[34](...continued)

FTC v. M.M., CV-04-2086 (E.D. NY May 18, 2004) (final order) (defendants sent "phishing" spam purporting to come from AOL or Paypal and created look-alike websites to obtain credit card numbers and other financial data from consumers that defendants used for unauthorized online purchases.). In addition, the FTC brought six complaints against marketers for purporting to sell international driver's permits that could be used to facilitate identity theft. Press Release, Federal Trade Commission, FTC Targets Sellers Who Deceptively Marketed International Driver's Permits over the Internet and via Spam (Jan. 16, 2003) (at http://www.ftc.gov/opa/2003/01/idpfinal.htm).

[35]The Commission has a separate toll-free line (877-FTC-HELP) to serve those with general consumer protection complaints.

[36]Spanish speaking counselors are available for callers who select the Spanish-language option on the toll-free line.

[37]As the relevant provisions of FACTA become effective, the Commission will update its advice to victims on their new rights and procedures for recovery.

obtain copies of their credit reports from the three national consumer reporting agencies and have a fraud alert placed on their credit reports;[38] (2) contact each of the creditors or service providers where the identity thief has established or accessed an account, to request that the account be closed and to dispute any associated charges; and (3) report the identity theft to the police and get a police report, which is very helpful in demonstrating to would-be creditors and debt collectors that the consumers are genuine victims of identity theft.

Counselors also advise victims having particular problems about their rights under relevant consumer credit laws including the FCRA,[39] the Fair Credit Billing Act,[40] the Truth in Lending Act,[41] and the Fair Debt Collection Practices Act.[42] If another federal agency can assist victims because the nature of the victims' identity theft falls within such agency's jurisdiction, callers also are referred to those agencies.

The FTC's identity theft website, located at www.consumer.gov/idtheft, provides equivalent service for those who prefer the immediacy of an online interaction. The site contains a secure complaint form, which allows victims to enter their identity theft information into the Clearinghouse. Victims also immediately can read and download all of the resources necessary

---

[38] These fraud alerts indicate that the consumer is to be contacted before new credit is issued in that consumer's name.

[39] 15 U.S.C. § 1681 *et seq.*

[40] *Id.* § 1666. The Fair Credit Billing Act generally applies to "open end" credit accounts, such as credit cards, revolving charge accounts, and overdraft checking accounts. It does not cover installment contracts, such as loans or extensions of credit that are repaid on a fixed schedule.

[41] *Id.* § 1601 *et seq.*

[42] *Id.* § 1692 *et seq.*

12

for reclaiming their credit record and good name, including the FTC's tremendously successful consumer education booklet, *Identity Theft: When Bad Things Happen to Your Good Name*.[43] The 26-page booklet, now in its fourth edition, comprehensively covers a range of topics, including the first steps to take for victims and how to correct more intensive credit-related problems that may result from identity theft. It also describes other federal and state resources that are available to victims who may be having particular problems as a result of the identity theft. The FTC alone has distributed more than 1.3 million copies of the booklet since its release in February 2000, and recorded over 1.4 million visits to the Web version.[44]

**B.     The Identity Theft Data Clearinghouse**

One of the primary purposes of the Identity Theft Act was to enable criminal law enforcement agencies to use a single database of victim complaints to support their investigations. To ensure that the database operates as a national clearinghouse for complaints, the FTC accepts complaints from external sources such as other state or federal agencies as well as directly from consumers through its call center and online complaint form. For example, in February 2001, the Social Security Administration Office of Inspector General (SSA-OIG) began providing the FTC with complaints from its fraud hotline, significantly enriching the FTC's database.

The Clearinghouse provides a picture of the nature, prevalence, and trends of the identity theft victims who submit complaints. The Commission publishes annual charts showing the

---

[43] *Identity Theft: When Bad Things Happen to Your Good Name* and the secure complaint form are available in Spanish.

[44] Other government agencies, including the Social Security Administration, the SEC, and the FDIC also have printed and distributed copies of *Identity Theft: When Bad Things Happen to Your Good Name*.

13

prevalence of identity theft complaints by states and by cities.[45]  Law enforcement and policy makers at all levels of government use these reports to better understand the challenges identity theft presents.

Since the inception of the Clearinghouse in July of 2000, more than 970 law enforcement agencies, from the federal to the local level, have signed up for secure online access to the database.  Individual investigators within those agencies have the ability to access the system from their desktop computers 24 hours a day, seven days a week.

The Commission actively encourages even greater use of the Clearinghouse.  Beginning in 2002, in an effort to further expand the use of the Clearinghouse among law enforcement, the FTC, in cooperation with the Department of Justice, the United States Postal Inspection Service, and the United States Secret Service, initiated full day identity theft training seminars for state and local law enforcement officers.  To date, seminars have been held in Washington, D.C., Des Moines, Chicago, San Francisco, Las Vegas, Dallas, Phoenix, New York City, Seattle, San Antonio, Orlando, and Raleigh.  The FTC also helped the Kansas and Missouri offices of the U.S. Attorney and State Attorney General conduct a training seminar in Kansas City.  More than 1500 officers have attended these seminars, representing more than 600 different agencies.  Future seminars are being planned for additional cities.

The FTC staff also developed an identity theft case referral program.[46]  The staff creates preliminary investigative reports by examining significant patterns of identity theft activity in the

---

[45] Charts that summarize data from the Clearinghouse can be found at http://www.consumer.gov/idtheft/stats.html and http://www.consumer.gov/sentinel/index.html.

[46] The referral program complements the regular use of the database by all law enforcers from their desktop computers.

Clearinghouse and refining the data through the use of additional investigative resources. Then the staff refers the investigative reports to appropriate Financial Crimes Task Forces and other law enforcers throughout the country for further investigation and potential prosecution. The FTC is aided in this work by its federal law enforcement partners including the United States Secret Service, the Federal Bureau of Investigation, and the United States Postal Inspection Service who provide staff and other resources. Recently, an FBI analyst has worked intensively with the Clearinghouse complaints, using sophisticated analytical software to find related complaints and combine the information with other data sources available to the FBI.

### C.    Outreach and Education

The Identity Theft Act also directed the FTC to educate consumers about identity theft. Recognizing that law enforcement and private industry each play an important role in helping consumers both to minimize their risk and to recover from identity theft, the FTC expanded its outreach and education mission to include these sectors.

(1) *Consumers*: The FTC has taken the lead in the development and dissemination of comprehensive consumer education materials for victims of identity theft and those concerned with preventing this crime. The FTC's extensive consumer and business education campaign includes print and online materials, media mailings, and radio and television interviews. The FTC also maintains the identity theft website, www.consumer.gov/idtheft, which includes the publications and links to testimony, reports, press releases, identity theft-related state laws, and other resources.

To increase awareness for the average consumer and provide tips for minimizing the risk of identity theft, the FTC developed a new primer on identity theft, *ID Theft: What's It All*

*About?*.[47]   Taken together with the detailed victim recovery guide, *Identity Theft: When Bad Things Happen to Your Good Name*, the two publications help to educate consumers.

(2) *Law Enforcement*:  Because law enforcement at the state and local level can provide significant practical assistance to victims, the FTC places a premium on outreach to such agencies.  In addition to the training described previously (*see infra* Section V.B), the staff joined with North Carolina's Attorney General Roy Cooper to send letters to every other Attorney General about the FTC's identity theft program and how each Attorney General could use the resources of the program to better assist residents of his or her state.  Other outreach initiatives include:  (i) Participation in a "Roll Call" video produced by the Secret Service, which has been sent to thousands of law enforcement departments across the country to instruct officers on identity theft, investigative resources, and assisting victims; and (ii) the redesign of the FTC's website to include a section for law enforcement with tips on how to help victims as well as resources for investigations.

(3) *Industry*:  The private sector can help with the problem of identity theft in several ways.  From prevention through better security and authentication, to helping victims recover, businesses play a key role in reducing the impact of identity theft.

(a) <u>Information Security Breaches</u>:  The FTC works with institutions that maintain personal information to identify ways to help keep that information safe from identity theft.[48]  In 2002, the FTC invited representatives from financial institutions, credit

---

[47]Since its release in May 2003, the FTC has distributed almost 554,000 paper copies and over 75,000 web versions, and developed a Spanish version.

[48]The Commission also has law enforcement authority relating to information security.  In addition to developing the Disposal Rule pursuant to FACTA, *see supra* Section IV, the

(continued...)

16

issuers, universities, and retailers to an informal roundtable discussion of how to prevent

unauthorized access to personal information in employee and customer records.

As awareness of the FTC's role in identity theft has grown, businesses and organizations

that have suffered compromises of personal information have begun to contact the FTC for

assistance.[49] To provide standardized assistance in these types of cases, the FTC developed a kit,

*Information Compromise and the Risk of Identity Theft: Guidance for Your Business,* that is

available on the identity theft website. The kit provides advice on contacting consumers, law

enforcement agencies, business contact information for the three major credit reporting agencies,

information about contacting the FTC for assistance, and a detailed explanation of what

information individuals need to know to protect themselves from identity theft.

(b) <u>Victim Assistance</u>:  Identity theft victims may spend substantial

time and effort restoring their good names and financial records. As a result, the FTC devotes

---

[48](...continued)
Commission also is responsible for enforcing its GLBA Safeguards Rule, which requires
financial institutions under the FTC's jurisdiction to develop and implement appropriate physical,
technical, and procedural safeguards to protect customer information.  FTC Safeguards Rule, 16
C.F.R. § 314.1 (2002).  In brief, the Safeguards Rule requires financial institutions to develop a
written information security plan that includes certain elements that are basic to security.

In the past few years, the FTC has also brought enforcement actions against four
companies that the Commission alleged made false promises about securing sensitive consumer
information, in violation of Section 5 of the FTC Act. 15 U.S.C. § 45(a) These actions resulted in
settlements with those companies that collected sensitive information from consumers while
making such promises.  Those actions arise out of the Commission's finding that these
companies' security measures were inadequate and their information security claims therefore
were deceptive.  *See, e.g., In re Microsoft Corp.,* FTC Dkt. C-4069, Final Decision and Order
available at http://www.ftc.gov/os/2002/12/microsoftdecision.pdf (Dec. 20, 2002).

[49]*See, e.g.* the incidents involving TriWest (Adam Clymer, *Officials Say Troops Risk
Identity Theft After Burglary,* N.Y. TIMES, Jan. 12, 2003, § 1 (Late Edition), at 12) and
Ford/Experian (Kathy M. Kristof and John J. Goldman, *3 Charged in Identity Theft Case,* LA
TIMES, Nov. 6, 2002, Main News, Part 1 (Home Edition), at 1).

substantial resources to conducting outreach with the private sector on ways to improve victim assistance procedures. One such initiative arose from the burdensome requirement that victims complete a different fraud affidavit for each different creditor with whom the identity thief had opened an account.[50] To reduce that burden, the FTC worked with industry and consumer advocates to create a standard form for victims to use in resolving identity theft debts. From its release in August 2001 through April 2004, the FTC has distributed more than 293,000 print copies of the ID Theft Affidavit. There have also been nearly 557,000 hits to the Web version. The affidavit is available in both English and Spanish.

## VI.   CONCLUSION

Identity theft places substantial costs on individuals and businesses. The Commission looks forward to working with businesses on better ways for them to protect the valuable information of consumers with which they are entrusted as well as other means of preventing identity theft. The Commission anticipates that as the new provisions of FACTA take effect, they will further help to reduce identity theft as well as its impact on victims.

---

[50] *See ID Theft: When Bad Things Happen to Your Good Name: Hearing Before the Subcomm. on Technology, Terrorism and Government Information of the Senate Judiciary Comm.* 106th Cong. (2000) (statement of Mrs. Maureen Mitchell, Identity Theft Victim).

18

# Exhibit

# E



**Federal Trade Commission**
**Protecting America's Consumers**

For Release: June 15 , 2004

## Provisions of New Fair and Accurate Credit Transactions Act Will Help Reduce Identity Theft and Help Victims Recover: FTC

The Federal Trade Commission today said that provisions of the recently enacted Fair and Accurate Credit Transactions Act will help reduce identity theft and help victims recover. In testimony to the House Ways and Means Committee's Subcommittee on Social Security, Howard Beales, Director of the FTC's Bureau of Consumer Protection, said that many of the provisions will go into effect over the course of this year.

The testimony says one of the newly enacted provisions requires the three major credit reporting agencies to provide consumers with a free copy of their own credit report every 12 months. The requirement will become effective in December but will be phased in over nine months from West to East. The reports allow consumers to discover and correct errors in their credit records and to assure that accounts have not been fraudulently opened in their names.

Another provision that will help prevent identity theft is the National Fraud Alert System. "Consumers who reasonably suspect they have been or may be victimized by identity theft, or who are military personnel on active duty away from home, can place an alert on their credit files. The alert will put potential creditors on notice that they must proceed with caution when granting credit," the testimony says. This provision will take effect December 1, 2004.

A provision of the law will require that account numbers on credit card receipts be shortened or "truncated" so that merchants, employees, or others who may have access to the receipts do not have access to consumers' names and full credit card numbers.

The testimony reports that the FTC is working with banking regulators to identify "red flag" indicators to help financial institutions and creditors analyze identity theft patterns so that they can take action to prevent further incidences of identity theft. The agencies also are working together to develop a rule that will require appropriate disposal of sensitive credit report information. "This requirement will help to ensure that sensitive consumer information, including Social Security numbers, is not simply left in a trash dumpster, for instance, once a business no longer needs the information," the testimony says.

Measures that will help consumers recover their credit reputations after they have been victims of identity theft include:

- A provision that will require credit reporting agencies to stop reporting allegedly fraudulent account information when a consumer establishes that he or she has been the victim of identity theft;

- A provision that requires creditors or businesses to provide copies of business records of fraudulent accounts or transactions related to them. "This information can assist victims in proving that they are, in fact, victims. For example, they may be better able to prove that the signature on the application is not their signature;" and,

- A provision that will allow consumers to report accounts affected by identity theft directly to creditors - in addition to credit reporting agencies - to prevent the spread of erroneous credit information.

"When fully implemented, these provisions should help to reduce the incidence of identity theft, and help victims recover when the problem does occur," the testimony says.

The Commission vote to issue the testimony was 5-0.

Copies of the testimony are available from the FTC's Web site at http://www.ftc.gov and also from the FTC's Consumer Response Center, Room 130, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The FTC works for the consumer to prevent fraudulent, deceptive, and unfair business practices in the marketplace and to provide information to help consumers spot, stop, and avoid them. To file a complaint in English or Spanish (bilingual counselors are available to take complaints), or to get free information on any of 150 consumer topics, call toll-free, 1-877-FTC-HELP (1-877-382-4357), or use the complaint form at http://www.ftc.gov. The FTC enters Internet, telemarketing, identity theft, and other fraud-related complaints into

Provisions of New Fair and Accurate Credit Transactions Act Will Help Reduce Identity ...    Page 2 of 2

Consumer Sentinel, a secure, online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

**Media Contact:**

Claudia Bourne Farrell
*Office of Public Affairs*
202-326-2181

**Staff Contact:**

Naomi B. Lefkovitz
*Bureau of Consumer Protection*
202-326-3058

**E-mail this News Release**
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

| Related Documents: |
|---|

**Prepared Statement of the Federal Trade Commission On Identity Theft and Social Security Numbers, Presented by J. Howard Beales, III, Director, Bureau of Consumer Protection, Before the Subcommittee On Social Security of the Committee On Ways and Means, United States House of Representatives (June 15, 2004)**

- Text of the Commission Testimony

**Consumer Information:**

- ID Theft

Last Modified: Monday, 25-Jun-2007 16:18:00 EDT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT D. LATTAS, <br> **Individually and on behalf of a class,** | ) <br> ) <br> ) | |
| **Plaintiff,** | ) <br> ) <br> ) | |
| **v.** | ) <br> ) | **Case No. 07 C 6309** |
| **SPRING RESTAURANT GROUP,** <br> **d/b/a SPRING RESTAURANT and/or** <br> **d/b/a SPRING; SHAWN MCCLAIN;** <br> **PETER DROHOMYRECKY; and SUE** <br> **KIM-DROHOMYRECKY,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Judge Moran** <br><br> **Magistrate Judge Schenkier** |
| **Defendants.** | ) <br> ) | |

### CERTIFICATE OF SERVICE

To:    Anthony G. Barone / David M. Jenkins, Barone & Jenkins, P.C.
       635 Butterfield Road, Suite 145, Oakbrook Terrace, IL 60181

       Marvin L. Frank / Lawrence D. McCabe, Murray, Frank & Sailer, LLP
       275 Madison Avenue, Suite 801, New York, NY 10016

I, Gerald W. Huston, certify that the foregoing **Defendants' Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Second Amended Complaint** were filed electronically with the Clerk of the Court on April 4, 2008, and that notification and service of such filing to all counsel of record will be accomplished pursuant to the CM/ECF system.

s/ Gerald W. Huston

HALL PRANGLE & SCHOONVELD
200 S. Wacker Drive, Suite 3300
Chicago, IL 60606
(312) 345-9600